UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re<br><br>**THE LODGE AT BIG SKY, LLC**,<br><br>  Debtor. | Case No. **10-62229-11** |
| In re<br><br>**THE LODGE AT BIG SKY MANAGEMENT COMPANY, LLC**,<br><br>  Debtor. | Case No. **10-62230-11** |

## *MEMORANDUM of DECISION*

At Butte in said District this 8th day of June, 2011.

In the above-referenced Chapter 11 bankruptcy cases, after due notice, the Court held a hearing on April 4, 2011, in Butte on: (1) the United States Trustee's Motion to Dismiss filed January 20, 2011, at docket entry no. 51 in Case No. 10-62229; (2) the United States Trustee's Motion to Convert to Case Under Chapter 7 filed January 20, 2011, at docket entry no. 52 in Case No. 10-62229; (3) First Financial Bank, N.A.'s Joinder in the United States Trustee's Motion to Dismiss or in the alternative, to Convert to Case Under Chapter 7; and (4) the United States Trustee's Motion for Order Directing Appointment of Chapter 11 Trustee filed February 1, 2011, in Case No. 10-62230. James A. Patten of Billings, Montana, appeared at the hearing on

1

behalf of The Lodge at Big Sky, Inc. ("Lodge"); Edward A. Murphy of Missoula, Montana, appeared at the hearing on behalf of The Lodge at Big Sky Management Company, LLC ("Management"); Daniel P. McKay of Great Falls, Montana, appeared on behalf of the United States Trustee ("UST"); Benjamin P. Hursh of Missoula, Montana, appeared on behalf of First Financial Bank, N.A. ("First Financial"); and William M. Kebe of Butte, Montana, appeared at the hearing on behalf of Lauren Quackenbush ("Lauren"). Scott Miller, Jeffrey Quackenbush and Lawrence Rezentes testified. First Financial's Exhibit 4, 5, 6, 7, 8, 10 and 11, and the UST's Exhibits C, G and H were admitted into evidence without objection.[1]

Although the United States Trustee's pending motions to dismiss and convert were filed on January 20, 2011, the hearing on said motions was not held until April 5, 2011. 11 U.S.C. § 1112(b)(3) directs that "[t]he court shall commence the hearing on a motion under this subsection not later than 30 days after filing of the motion[.]" Debtor originally set the matter for hearing on March 1, 2011. However, the Debtors, First Financial Bank, N.A., the United States Trustee and Lauren Quackenbush filed on February 25, 2011, a stipulation to continue the March 1, 2011, hearing to April 4, 2011. The United States Trustee's participation in the stipulation filed February 25, 2011, is deemed a waiver of the statutory right to have the motion heard within 30 days of its filing.

By Order entered April 8, 2011, the above-referenced bankruptcy cases were

---

[1] The Debtors' Exhibits 1, 2, 3, 4, 5, 6, 7 and 8 were also admitted into evidence, but said exhibits were offered in support of the Debtors' Motion for Substantive Consolidation, which motion was granted by separate order.

substantively consolidated.[2] Because of the April 8, 2011, substantive consolidation and notwithstanding 11 U.S.C. § 1112,(b)(3), the Court deemed it appropriate to hold the UST's pending motions, together with First Financial's joinder thereto, in abeyance to afford the Debtors time to file a consolidated Chapter 11 plan. As noted in an Order entered April 8, 2011, the Court would be better able to evaluate the UST's pending motions and the requirements of 11 U.S.C. § 1112(b) if the Debtors were granted additional time to file a consolidated Chapter 11 plan and disclosure statement. The Court noted at that time several areas of concern, including whether Debtors had any reasonable prospect of moving forward under Quackenbush's direction. For example, the Court agreed with the UST that Quackenbush may not be the proper person to direct the Debtors' activities, particularly when Quackenbush took in excess of $225,000 from the Debtors in the twelve months leading up to the Debtors' bankruptcy petition date.

The Debtors filed a consolidated Amended Chapter 11 Plan and an Amended Disclosure Statement on April 22, 2011. After due notice, the Court held a hearing on approval of the Debtors' Amended Disclosure Statement on held May 17, 2011, in Butte. Debtors were represented at the May 17, 2011, hearing by James A. Patten of Billings, Montana; the Office of the United States Trustee was represented by Daniel P. McKay of Great Falls, Montana; and First Financial was represented by Benjamin P. Hursh of Missoula, Montana. Jeffrey Quackenbush and Michael Elliott testified and First Financial's Exhibits 1 through 6, 8 and 9 were admitted into evidence without objection.

Because the above-referenced cases were just recently consolidated on April 8, 2011, the

---

[2] Counsel for First Financial stated at the April 4, 2011, hearing that First Financial did not support substantive consolidation "if consolidation is synonymous with Mr. Quackenbush staying at the helm of the organizations."

Court has determined that compelling circumstances justify an extension of the 15-day period referenced in 11 U.S.C. § 1112(b)(3). Indeed, the UST's lack of objection to the Court's decision to grant Debtors' time to file a consolidated plan and disclosure statement is deemed a waiver of such time frame. Moreover, because of the Memorial Day holiday and because of other Court demands upon the undersigned's time, compelling circumstances justify this Court entering its decision more than 15 days after the hearing held May 17, 2011. This Memorandum of Decision sets forth the Court's findings of fact and conclusions of law with respect to the pending matters heard April 4, 2011, and May 17, 2011.

## BACKGROUND

Jeffrey Quackenbush ("Quackenbush") is the managing member of Lodge and Management. Lodge and Management are single member limited liability companies. On December 31, 2007, Quackenbush, through Lodge, purchased real property consisting of 85 condominium units located at 75 Sitting Bill Road, Big Sky, Montana. The property, located at the base of Big Sky Ski Resort in what is know as Mountain Village, was built and operated as a hotel but was later converted to 90 condominium units. Five of the 90 condominium units were sold prior to December 31, 2007.[3] Thus, Lodge purchased only 85 of the 90 existing condominium units. First Financial, f/k/a Irwin Union Bank & Trust, loaned Lodge $7.5 million to purchase the condominium units and as a result, has a first position lien against the condominium units. Quackenbush personally guaranteed Lodge's obligation to First Financial. SEC Realty has a second position lien against Lodge's 85 condominium units in the amount of

---

[3] Testimony suggests that one of the units owned by a third-party was foreclosed on by GMAC Mortgage and a second unit is under a notice of foreclosure.

$1,775,000.

Although the original intent was to sell the 85 condominium units, such units did not sell. Quackenbush, through Lodge, consequently operated the 85 condominium units as a hotel from December 31, 2007, to August 2008. Quackenbush formed Management in August 2008, which is coincidentally around the same time that Quackenbush's spouse filed for divorce in Florida, and shortly thereafter, Management took over operations of Lodge's 85 condominium units and the other five condominium units owned by third parties.

Management continues to operate the condominium units as a hotel. The hotel is seasonal, operating for 150 days during the winter and 90 days during the summer. A separate and small, closely-held corporation, Altitudes, operates a food and beverage service at the Lodge. Quackenbush is the sole shareholder of Altitudes.

Management's sole source of income is from the rental of the 90 condominium units. According to Quackenbush, Management is supposed to pay all expenses attributable to the 90 condominium units except real estate taxes and debt service on the units, including Lodge's notes. Lodge's sole source of income is supposed to be some portion of the net rental revenues Management receives from Lodge's 85 condominium units. Quackenbush testified that he never established a formal written management agreement between Lodge and Management but rather, referred to the management agreement as being in his head. It is also not clear whether Management has any written agreement with the other five unit owners. What is clear is that Management paid nothing to Lodge in 2009, 2010 or 2011.[4] As of the petition date, Lodge had

---

[4] Lodge's Statement of Financial Affairs also shows that it had no income in 2008. Contrary to the Statement of Financial Affairs, which bears Quackenbush's electronic signature dated September 28, 2010, Quackenbush testified that Lodge did receive income in 2008 and that

not paid any property taxes due after November of 2008, but $354,348.30 of delinquent property taxes and past due charges owing to the Big Sky Water & Sewer District have since been paid at the direction of this Court pursuant to the Court's grant of First Financial's motion for adequate protection on April 8, 2011. Lodge has not made a payment to First Financial since January or February of 2009.

    Lodge's schedules show that it has assets valued at $3,541,681.45, consisting of the condominium units valued at $3.5 million, cash of $721.45, various items of office equipment, furnishings and supplies valued at $35,230, and machinery, fixtures, equipment and supplies used in business valued at $5,730. Lodge has a total debt of $11,543,618.42. Lodge's Statement of Financial Affairs shows Lodge had no income in 2008, 2009 or 2010. First Financial, f/k/a Irwin Union Bank & Trust, asserts that as of the petition date, Lodge owed it $8,287,176.56 on a $7,500,000 purchase money loan for the condominium units. That loan is secured by a first position lien on the condominiums, and was personally guaranteed by Quackenbush. SEC Realty is owed $1,775,000, which amount is secured by a second position deed of trust on the 85 condominium units. Madison County's Proof of Claim shows Lodge owed $383,862.85 in real property taxes for years 2008, 2009 and the first half of 2010. As noted earlier, the delinquent taxes were paid post-petition. Although Lodge has not made a payment since 2008 to either the first or second position lien creditors, and although Lodge had not paid its real property taxes, Lodge paid Quackenbush $10,000 on January 20, 2010. Lodge's bankruptcy attorney held $25,323.33 in trust as of September 14, 2010. Lodge's Schedule F lists Bank of America in the amount of $27,309.61, Big Sky Owners Association in the amount of $30,600 and Quackenbush

---

"[w]e were paying [Lodge's] debt service all the way through 2008[.]"

in the amount of $1,268,349.47 as the sole unsecured creditors.

Management's schedules disclose that as of the petition date, Management had assets valued at $567,431.45, which amount included $503,114.71 of cash or cash equivalents and a security deposit of $20,000 with ABACO Energy Services. Management lists $120,041.30 of debts. Management discloses in the Statement of Financial Affairs that its gross income was $1,106,162.66 in 2010; $1,069,690 in 2009; and $1,046,404 in 2008. The Debtors represented in the Amended Disclosure Statement that revenues in 2010 were 123 percent higher than the revenues in 2009.

Management transferred $70,730.85 to Altitudes in 2010. Management also distributed a total of $219,680 to Quackenbush between November 4, 2009, and November 14, 2010. Of the forgoing amount, $130,000 was distributed to Quackenbush on Management's petition date, September 14, 2010. Management's attorney held $12,886 in trust as of September 14, 2010.

Management's balance sheet dated September 14, 2010, shows $239,980.14 due from Lodge and $131,234.92 due to Lodge for room commission. However, the due to and due from amounts between Management and Lodge were not reflected on the Debtors' schedules and have not been carried through to the Debtors' monthly operating reports. Quackenbush testified that he left the due to and due from amounts between Management and Lodge off the schedules and monthly operating reports because such amounts "were basically kept for internal use only. Basically what happened is – as I told you about, the plan that's in my head, it's a 50/50 split."

Quackenbush described the agreement between Lodge and Management as Management's largest asset. Quackenbush caused Lodge to file a motion to reject the agreement. However, the Court granted Debtors' request for substantive consolidation, rendering Lodge's

7

motion to reject its agreement with Management moot.

Neither Management nor Lodge have taken any action to recover any of the monies paid to Quackenbush or Altitudes. Quackenbush testified that he would seek recovery of said monies if "ordered so by the Court." Quackenbush testified that his sole source of personal income is the funds he receives from Management and Lodge. Quackenbush's "goal is to keep and work The Lodge and make it work . . . the whole goal that I have in my life right now is to finish my divorce, rework out this Lodge or figure out a way that I can keep it, and continue going." Contrary to the foregoing, Quackenbush conceded that First Financial has "not had a penny in two and a half years[,]" that he is "happy to entertain everything[,]" and that he has "never had a problem with achieving a better result for [First Financial.]" To this end, Quackenbush has told First Financial numerous times that if the Debtors had to file bankruptcy, Quackenbush would pursue a liquidating plan with a sale of the condominium units free and clear of all liens.

On July 31, 2009, First Financial filed an action in Madison County to foreclose its interest in Lodge's 85 condominium units and to enforce Quackenbush's personal guaranty. In response, Quackenbush filed a personal Chapter 11 bankruptcy on August 14, 2009. Thereafter, First Financial agreed to forbear from enforcing its rights until September 15, 2010, to give Quackenbush additional time to sell the condominium units. Quackenbush failed to sell the condominium units, and instead caused Lodge and Management to seek protection under Chapter 11 of the Bankruptcy Code on September 14, 2010. Quackenbush testified that he caused the Debtors to seek bankruptcy protection because of the actions taken by his estranged spouse in the Florida divorce proceeding, and not because of the pending foreclosure by First Financial.

Quackenbush has received numerous offers to purchase the Lodge's condominium units.

For instance, in September of 2009, Quackenbush received an offer of $5.1 million. Quackenbush received another offer of $4 million in January or February of 2010 and a offer of $4,575,000 in March of 2010. Quackenbush also received several lower offers, but Quackenbush testified that he could not entertain offers in the $2 million to $3.5 million range because he did not have enough cash on hand to pay the delinquent property taxes and the second position lien creditor. Other offers were discussed at the hearing, but it appears those offers may not have materialized into written offers. Most recently, Quackenbush, through his real estate agent, received a letter of intent dated April 27, 2011, wherein Tiarna Real Estate Services, Inc. expressed its desire to purchase the Debtors' assets for $4.2 million. The evidence suggests that at least one of the prospective buyers was frustrated with Quackenbush's failure to timely provide financial information. However, it was also evident that the prebankruptcy sales could not close because SEC Realty would not release its second position lien without substantial payment.

As noted earlier, the Court consolidated the bankruptcy cases of Lodge and Management on April 8, 2011. The Court expressed concern at that time that, going forward, Quackenbush may not be the appropriate person to direct the Debtors' activities, particularly where Quackenbush took in excess of $225,000 from the Debtors in the twelve months leading up to the Debtors' bankruptcy petition date and has made no effort to recover such funds.

As instructed, the Debtors filed a consolidated Amended Chapter 11 Plan and an Amended Disclosure Statement on April 22, 2011. Debtors' counsel appeared at the May 17, 2011, hearing and after reviewing the objections to approval of Debtors' disclosure statement filed by the UST and First Financial, stated that Debtors were "agreeable to amending the

9

disclosure statement to address all things other than the alleged violation of the absolute priority rule or that the plan doesn't meet the -- doesn't test the marketplace, and the discussion of the treatment of the First Financial deficiency claim.  All of those are plan issues and should be dealt with in the plan-confirmation process, but the rest of the issues raised by the trustee can be addressed in amendment to the disclosure statement."  The Debtors' Amended Chapter 11 Plan contemplates that Quackenbush's current ownership interest in the Debtors will be extinguished.  An investor will then contribute $200,000 as an equity investment on the Effective Date and in return, the equity investor will receive a 99% ownership interest in the reorganized Debtors while Quackenbush will retain control of the reorganized Debtors along with a 1% ownership interest.  The investor is Barry Blenis, who is listed as one of the 20 largest creditors in Quackenbush's personal bankruptcy.  Quackenbush testified that he and Blenis do not have any written documentation memorializing their agreement.  Debtors' plan proposes to pay all administrative expenses on or before the Effective Date.  Debtors' plan next proposes to pay the first position lien creditor, First Financial, $2,468,500 over a period of 25 years with interest at 5%.  SEC Realty will be paid $24,000 over a period of 24 months.  Priority tax claimants, consisting for Big Sky Resort Area District, Unemployment Insurance Division, Internal Revenue Service and the Montana Department of Revenue, will be paid in full over a period of 36 months.  Creditors holding general unsecured trade claims, excluding Quackenbush, will also be paid in full over a period of 60 months.

      With regard to the proposed payment to SEC Realty, Quackenbush testified that the Debtors were proposing the $24,000 payment, even though SEC Realty is arguably only entitled to payment as a general unsecured creditor, because Debtors were hoping to secure the vote of an

impaired creditor. On this topic, the following exchange took place between First Financial's counsel and Quackenbush at the May 17, 2011, hearing:

> Q. Okay. So you're hoping that by paying [SEC Realty] $24,000 under this current proposal, he'll vote "yes" as opposed to voting "no."
>
> A. If I were going to get - - had my choice of $24,000 or zero, I would vote "yes."
>
> Q. Okay. And have you talked to Mr. Stewart - -
>
> A. Yes.
>
> Q. - - at SEC about this?
>
> A. Yes, I have.
>
> Q. Okay. When did you talk to Mr. Stewart about this?
>
> A. I talked to him right before we amended our plan.
>
> Q. Okay. And reached an agreement where if you changed it to put $24,000 in, he would vote "yes" on the plan?
>
> A. Yes.

With a tacit concession by Debtors' counsel that Debtors' Amended Disclosure Statement filed April 22, 2011, does not contain information of a kind, and in sufficient detail to enable a hypothetical investor to make an informed judgment about Debtors' consolidated Amended Chapter 11 Plan, the Court turns to the pending matters.

## APPLICABLE LAW

Prior to enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub. L. 109-8 Stat. 23 § 442 (Apr. 20, 2005), § 1112(b) provided that a court "may" convert or dismiss a Chapter 11 case for cause. Subsequent to the enactment of BAPCPA, it appears that the Court's discretion with respect to conversion or dismissal has been

11

circumscribed. As explained in 7 COLLIER ON BANKRUPTCY, ¶ 1112.01[2] (16th ed.):

> Dismissal of the chapter 11 case, or conversion of the case to chapter 7 other than under section 1112(a), is upon demonstration of cause by the requesting movant. If cause is demonstrated under the current statute, the court must grant relief, unless it is found that one of the exceptions in section 1112(b)(1) or (2) applies. The court does have the discretion to determine whether dismissal, conversion to chapter 7 or appointment of a trustee or examiner is in the best interest of creditors and the estate. The court also has discretion in determining what additional facts not enumerated in section 11112(b)(4) constitute cause.

In considering the cause standard under 11 U.S.C. § 1112(b), 7 COLLIER ON BANKRUPTCY, ¶ 1112.04[5][a] (16th ed.), further explains:

> As the Supreme Court has observed, chapter 11 embraces the "two recognized policies [of] preserving going concerns and maximizing property available to satisfy creditors." As the House Report states:
>
>> The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they were designed are more valuable than those same assets sold for scrap.
>
> As a general rule, if continuing a particular chapter 11 case would promote the twin goals of preserving viable businesses and maximizing the creditors' return, then the case is probably not a candidate for conversion or dismissal under section 1112(b). On the other hand, chapter 11 is not a panacea for every debtor in distress. Many troubled businesses are simply not viable and most debtors that enter chapter 11 do not succeed in confirming a chapter 11 plan. In addition, the costs of the reorganization process may outweigh the likely benefits in any particular case.

A plain reading of the statute shows that a movant bears the initial burden to establish "cause" for conversion under § 1112(b)(1). *See* 11 U.S.C. § 1112(b)(1). As noted above, a non-exhaustive list of what constitutes "cause" is found in § 1112(b)(4), but the Court may also "consider other factors as they arise." *In re Brown*, 951 F.2d 564, 572 (3rd Cir.1991) *citing*

S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5903; H.R.Rep. No. 595, 95th Cong., 1st Sess. 406 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6362.

As discussed in COLLIER ON BANKRUPTCY, once a movant establishes cause, the burden then shifts to the debtor to prove it falls within the § 1112(b)(2) "unusual circumstances" exception to § 1112(b)(1)'s mandatory conversion. Section 1112(b)(2) creates an exception to § 1112(b)(1) by directing that, absent unusual circumstances, the court "may not" convert or dismiss the case if "(A) there is a reasonable likelihood that a plan will be confirmed within the time-frames established in sections 1121(e) and 1129(e) . . within a reasonable time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than" substantial or continuing loss to or diminution of the estate "(i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court."

In addition, § 1104(a) directs that "the court shall order the appointment of a trustee – (1) for cause, including . . . gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . .; or (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate[.]" When only § 1104(a) is implicated, such as when a movant shows gross mismanagement of the affairs of the debtor by current management before commencement of the case, a court's discretion is limited in that it generally must appoint a chapter 11 trustee. However, when §§ 1104(a) and 1112(b) are both implicated, such as when a movant shows gross mismanagement of the affairs of the estate after commencement of the case, it logically follows that courts have latitude on deciding whether to convert the case to chapter 7, appoint a chapter

13

11 trustee or dismiss the case.

## DISCUSSION

The evidence in this case shows that Quackenbush grossly mismanaged the Debtors prepetition when he failed to pay real estate taxes and the first and second lienholders, while at the same time transferring substantial sums of money from the Debtors to himself. Quackenbush has also grossly mismanaged the Debtors post-petition by failing to make any effort to recover the funds that Quackenbush took from the Debtors in the year leading up to their petition date, including the $130,000 that Quackenbush paid to himself on the morning the Debtors' bankruptcy petitions were filed. Such omission is gross mismanagement.

Quackenbush's gross mismanagement of the Debtors pre- and post-petition brings this case within the scope of both §§ 1104 and 1112(b)(1). In addition, the Court finds that the Debtors cannot seek refuge under the § 1112(b)(2) exception because the Court does not find unusual circumstances or a reasonable likelihood that a plan will be confirmed within a reasonable period of time. Debtors' counsel argued that the confirmation proceedings were put on hold during the pendency of Quackenbush's divorce proceeding. The Court disagrees. While the Court would agree it put confirmation of Quackenbush's personal Chapter 11 plan on hold pending a division of Quackenbush's marital estate by the Florida court, this Court did not put the Debtors' confirmation proceedings on hold.

Indeed, once First Financial made a showing of cause for conversion or dismissal, it was incumbent upon the Debtors to take some steps toward confirmation in order to demonstrate a reasonable likelihood a plan would be confirmed within a reasonable period of time. When the Court consolidated these cases on April 8, 2011, and granted Debtors an opportunity to file a

consolidated disclosure statement and plan, the Court fully anticipated that Debtors would make every effort to file an adequate disclosure statement and a confirmable plan. The opportunity this Court gave Debtors to file a consolidated disclosure statement and plan was not meant to be an exercise in futility. Debtors did not seize the opportunity and instead filed a proposed plan that plainly will not pass muster at a confirmation hearing.

Quackenbush, through the Debtors' consolidated plan, proposes to pay: (1) allowed administrative claims; (2) the allowed secured claim in Class I which the Debtors list as disputed in the amount of $30,600; (3) $2,568,500 to First Financial; (4) $24,000 to SEC Realty; (5) all of the allowed priority claims, which at this time total approximately $29,000; (6) and to pay all the allowed trade claims, which arguably do not total more than $115,000. In sum, Debtors seek to pay roughly $2,851,044.42, plus administrative claims, on debts that exceed $10 million and which debts are secured by property with a value, according to Debtors' schedules, of at least $3.5 million.

Notwithstanding the valuation contained in Debtors' schedules, the Debtors and Quackenbush now seek to reduce the value of the condominium units with no credible evidence to support such tactic. What the evidence does show is that Valuation & Litigation Services, LLC did an appraisal as of April 30, 2009, and estimated that the combined value of Lodge, Management and Altitudes was $4,577,000. On or about October 9, 2009, Lake Union Partners Seattle, LLC subsequently presented Quackenbush with an offer of $5,150,000 for the real property owned by Lodge. In response to the offer of $5,150,000 Quackenbush proposed that approximately $1.3 million would be set aside for Quackenbush to allocate and pay other creditors, including "half a million dollars . . . to the second mortgage person, I believe a little

15

over a quarter of a million dollars was to pay the taxes and get that all caught up, I believe there was another quarter of a million dollars to my mother-in-law, and other incidentals to clear up a couple little personal things." First Financial understandably balked at Quackenbush's proposal and countered that they would allow Debtors to pay the delinquent property taxes, $50,000 to the second position lien creditor, SEC Realty, and after payment of real estate commissions and other normal closing costs, the balance of the proceeds would go to First Financial. First Financial would not agree to permit Quackenbush to use any of the sales proceeds to pay his personal debts. SEC Realty refused to release its second position lien for $50,000, resulting in a failed sale.

     Later, Lake Union Partners, in a letter dated January 11, 2010, expressed their continued enthusiasm about possibly purchasing the 85 condominium units. Following one or two telephone conversations, the parties agreed to a reduced price of $4,575,000. According to an agreement with First Financial, $200,000 of the $4,575,000 sale would go to Quackenbush's mother-in-law. SEC Realty's second position lien interest would be handled through a quick bankruptcy proceeding. For whatever reason, that deal has not come to fruition.

     Lodge received another offer of $4,500,000 on March 16, 2010, from Eric Winslow and Rao Yalamanchilli. These buyers failed to make the required deposit and in a later email, reduced their offer to $3.5 million. More recently, Debtors received a letter of intent in April of 2011, wherein a prospective buyer offered to purchase the Debtors' assets for $4.2 million.

     As previously mentioned, Quackenbush originally purchased the condominium units with the intent to sell them individually. Quackenbush has not been able to sell the condominiums and has thus had to operate the property has a hotel. However, as a hotel operation,

16

Quackenbush conceded that he was "in a business that, when [he] bought it, couldn't afford the cash flow."[5] Quackenbush thus seeks to obliterate over two-thirds of Lodge's debt in an effort to make the hotel operation sustainable from a cash flow perspective. Quackenbush's desire to retain and manage the hotel operation, as proposed in Debtors' consolidated plan, is self-serving. The major benefit of the current proposal is an annual salary to Quackenbush combined with Quackenbush's continued control of the hotel operation and a continued ownership in the Debtors, albeit only 1 percent. Quackenbush thinks such proposal is good because he "wants to run this place. I'd run it very, very well. I mean, for instance, this year, I spent $5,000 on upgrading our Wi-Fi throughout the whole hotel. Now, is that a good decision - - ." Even though Quackenbush thinks he can run the Debtors' operations "very, very well[,]" he also conceded that he is "the same guy" who did not pay the Debtors' property taxes or service any of the secured debt, but instead transferred $220,000 to himself. Quackenbush's proposal is not fair and equitable, particularly as to First Financial, who was owed $8,287,176.56 as of Lodge's petition date.

The Court simply could not and would not confirm a plan that contemplates total payment to creditors and claimants of less than $3 million when the Debtors failed to test or prove their valuation assumptions, particularly when Quackenbush seeks to strip the existing liens and leave the Debtors with as much as $1.2 million of equity, and sell 99 percent of that equity for $200,000. First Financial has persuasively demonstrated that Quackenbush is now seeking to utilize the reorganization process for personal financial gain, to First Financial's

---

[5] The Debtors' Amended Disclosure Statement similarly states that "[t]he Appraisal of October 2007 indicated that the cash flow would only support debt service on $4 million. These projections were prior to the economic downturn of 2008 through 2010."

detriment. As one court aptly explained, "[t]he debtor or its equity holders are the last category of persons or entities which the code is designed to benefit." *Capital Mgmt Co. v. The Allison Corp. (In re The Alison Corp.)*, 9 B.R. 827, 829 (Bankr. S.D.Cal. 1981). Someone other than Quackenbush must direct the Debtors going forward.

Unfortunately for Debtors and Quackenbush, the time has come for the Court to render a decision on the pending motions to dismiss, covert or appoint a Chapter 11 trustee. As stated in the concurring opinion of Chief Justice Clark in *In re Timbers of Inwood Forest Assoc., Ltd.*, 808 F.2d 363, 374 (5th Cir. 1987), "[r]eorganization is not a Holy Grail to be pursued at any length. Creditors are entitled to a prompt determination of efficacy." The sole remaining question is which form of relief is in the best interests of creditors and the estate.

Dismissal is not a viable option because it puts the parties back in the same quandary they were facing in 2009 and 2010. Conversion to chapter 7 or appointment of a chapter 11 trustee are the remaining alternatives. At the present time, the Debtors are between their winter and summer seasons and the Debtors' hotel operations are closed. Because of the time and expense required in the Chapter 11 process, this Court concludes that conversion of these consolidated bankruptcy cases to Chapter 7 is in the best interest of all parties. A chapter 7 trustee will undoubtedly be appointed quickly and hopefully the trustee can immediately start the process for an orderly liquidation of the Debtors' assets so an eventual purchaser can commence operation for the upcoming ski season. Accordingly, the Court will enter a separate order providing as follows:

IT IS ORDERED the United States Trustee's Motion to Dismiss filed January 20, 2011, at docket entry no. 51 in Case No. 10-62229, is DENIED; (2) the United States Trustee's Motion

18

to Convert to Case Under Chapter 7 filed January 20, 2011, at docket entry no. 52 in Case No. 10-62229, is GRANTED; and these consolidated bankruptcy cases are converted to Chapter 7 of the Bankruptcy Code; (3) First Financial Bank, N.A.'s Joinder in the United States Trustee's Motion to Dismiss or in the alternative, to Convert to Case Under Chapter 7, is granted, in part; and (4) the United States Trustee's Motion for Order Directing Appointment of Chapter 11 Trustee filed February 1, 2011, in Case No. 10-62230, is DENIED as moot.

                                        BY THE COURT

                                        HON. RALPH B. KIRSCHER
                                        U.S. Bankruptcy Judge
                                        United States Bankruptcy Court
                                        District of Montana